**MALLINCKRODT INC. et al.,**

v.

**MASIMO CORPORATION et al.,**

**This Document Relates to All Actions**

**No. CV 00–06506 MRP.**

United States District Court,
C.D. California.

July 3, 2003.

Craig N. Hentschel of Arnold & Porter, Los Angeles, CA, Robert C. Morgan of Fish & Neave, New York City, Kevin P.B. Johnson, Terrence Kearney and Brian C. Cannon of Fish & Neave, Palo Alto, CA, for Plaintiffs.

James F. Lesniak, Joseph R. Re, Stephen C. Jensen, and Jon W. Gurka of Knobbe, Martens, Olson & Bear, LLP, Irvine, CA, for Defendants.

## MEMORANDUM OF DECISION AND ORDER RE:

### Masimo's Motion for Summary Judgment Re Ownership of Patents

PFAELZER, District Judge.

### I. Background

In this patent infringement suit, defendant Masimo Corp. ("Masimo") counterclaims, alleging that plaintiffs Nellcor Puritan Bennett Inc. and Mallinckrodt Inc. ("Nellcor") infringe on certain Masimo patents through the sale of certain products. On its part, Nellcor, in its Third Counterclaim, seeks a declaratory judgment that it owns each and every one of the Masimo patents asserted in this case. The issue presented by the Motion for Summary Judgment before the Court is the ownership of those Masimo patents.

At the center of this controversy is Newport Medical Electronics, Inc. ("Newport"), a California corporation incorporated in March 1988 for the purposes of developing and marketing inexpensive pulse oximeters. In pursuit of this goal, Newport hired Joe Kiani in May 1988. Kiani was granted 160,000 shares of Newport stock as well as a seat on Newport's Board of Directors. Additionally, Kiani's sister received 30,000 shares of Newport stock.

In the summer of 1988, Kiani conceived of employing an adaptive filter in a pulse oximeter. He suggested using an adaptive filter to the Newport Board of Directors, but also warned that this effort would cause further delay. As things stood, Kiani had already informed the board that the team would be unable to meet the original February 1989 deadline, and it would take until May 1989 to develop just a rudimentary oximeter without an adaptive filter. Employment of an adaptive filter would further push the timetable out until October 1990. Unwilling to tolerate further delays, Newport rejected Kiani's idea.

Newport contends that its decision with respect to adaptive filters was a temporary one. In the interest of time and for marketing purposes, Newport ordered Kiani to complete a simplified version of the pulse oximeter without adaptive filters, designated "Rev. 1." No efforts were made to develop a pulse oximeter that incorporated adaptive filters. At all times, however, Newport claims that its intent was to eventually create an oximeter that used an adaptive filter. (Opp'n at 5.)

Kiani resigned from Newport in April 1989. Upon leaving the company, Kiani and Newport had various disputes over the shares that Newport had previously grant-

ed to him and over the ownership of work that Kiani purportedly had done for Newport. Ultimately, Kiani agreed to return the 190,000 shares of Newport stock he and his sister owned pursuant to a Mutual Release entered into with Newport in May 1990. The terms and the interpretation of the Mutual Release are the subject of the current motion and are described in more detail below.

In May 1989, Kiani formed his own company to pursue the design and sale of pulse oximeters, Vital Signals, Inc. This company later became known as Masimo, Inc., the defendant/counter-claimant in this case. At the same time, Newport suffered financially. Eventually, the pulse oximeter project was shuttered, and the company abandoned. Newport was officially suspended by the State of California on January 2, 1992 for failure to pay fees and taxes. At the time that Newport was closed, it had completed a prototype pulse oximeter, but it had not done any work on the incorporation of adaptive filters.

Newport remained inactive until 2002 when Nellcor, in the midst of this patent infringement lawsuit, revived Newport by paying the latter's delinquent California corporate fees and taxes for the previous ten years. It executed an asset purchase agreement whereby Nellcor purchased "pulse oximetry algorithms and systems" for $200,000. Having resurrected Newport and now standing in its shoes, Nellcor pleads that Masimo does not own its patents-in-suit.

Masimo, for its part, requests summary judgment against Nellcor's ownership claims on four alternative theories. First, it argues that the Mutual Release precludes any claim that Nellcor owns Masimo's patents. Second, Masimo claims that even before it was shuttered, Newport had already abandoned any rights it could have had in Kiani's idea. Third, Masimo argues that the applicable two year statute of limitations bars Nellcor's claim. Finally, it argues that Nellcor cannot possess a shop right in the invention of Masimo's patents. As discussed below, the Court finds Masimo's first argument to be dispositive.

## II. Legal Standard

Summary judgment is appropriate when the moving party has demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Under the summary judgment standard, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505. The interpretation of a written agreement is a question of law. *See Pacific Gas & Electric Co. v. Zuckerman*, 189 Cal.App.3d 1113, 1143, 234 Cal.Rptr. 630 (Cal.Ct.App.1987).

## III. Discussion

### A. Terms of the Mutual Release

The Mutual Release was executed on May 19, 1990. It recites that part of the background to the Mutual Release is the fact that Newport "has previously threatened to sue Kiani for working in any competitive industry, or with companies which may be competitors, to Newport and for theft of corporate proprietary information." (Mutual Release at 1.) Having recited this history, Newport provided Kiani with a comprehensive release of liabilities. (Mutual Release ¶ 2.) In addition, the Mutual Release separately makes clear the intent of the parties to "release any and all rights and claims that may exist or come

into being between the parties and to eliminate any potential for disputes between the parties in the future." (Mutual Release ¶ 3.) Kiani gave a substantially similar release to Newport. (Mutual Release ¶ 1.)

Perhaps most relevant to the motion at hand, however, is the Mutual Release's treatment of the intellectual property developed by Kiani while he was employed by Newport. The agreement defines "Product" as "that certain pulse-oximeter which was developed by Newport under supervision by Kiani." (Mutual Release at 1.) In the Mutual Release, Kiani released all claims against Newport, including "any claim of ownership to the Product by Kiani" (the "ownership clause"). (Mutual Release ¶ 1.) On the other hand, Newport also acknowledged that Kiani was not in possession of any proprietary information of Newport (the "possession clause"). (Mutual Release ¶ 2.)

## B. The Release

At the center of the dispute between the two parties is the proper interpretation of Paragraphs 1 and 2 of the Mutual Release. Kiani argues that the terms of the Mutual Release gave him free reign to start Masimo and his quest to build a pulse oximeter with adaptive filters. He argues that by acknowledging in the possession clause in Paragraph 2 that Kiani was not in possession of any Newport proprietary information, Newport meant just that—Kiani did not have anything that belonged to Newport. Whatever skills, knowledge, and otherwise that Kiani brought to Masimo could not have belonged to Newport.

Nellcor contends that Kiani specifically disclaimed ownership over the Product in the ownership clause in Paragraph 1 of the Mutual Release, and thereby confirmed Newport's ownership of ideas created during Kiani's tenure, including the idea of incorporating an adaptive filter in a pulse oximeter. According to Nellcor, the definition of Product encompasses all works and ideas related to pulse oximetry conceived and developed by Kiani during his tenure. Under this view, it matters not that the specifications for Rev. 1 did not call for adaptive filters or that Rev. 1 appears to not have been completed during Kiani's time. The critical facts are that Kiani was hired to develop a pulse oximeter and he conceived of the idea of incorporating an adaptive filter while he was at Newport. These two facts, say Nellcor, make the adaptive filter idea part of the Product covered by the Mutual Release.

Nellcor's reading of the Mutual Release is a flawed one. To begin with, the definition of Product is not as broad as Nellcor would have it. Product is defined as "that certain pulse-oximeter which was developed by Newport under supervision by Kiani." (Mutual Release at 1.) Three portions of this definition contradict Nellcor's reading by suggesting that the parties meant to define Product narrowly only as the specific pulse oximeter (i.e., Rev.1) that Kiani developed. First, the definition of product refers to a "certain pulse-oximeter." This implies that the Product is a specific product, and does not encompass everything that Kiani worked on while at Newport. Second, the Product is one that was actually "developed" by Newport. Although Newport contends that it intended all along to pursue a pulse oximeter with adaptive filters at a later time, there is no dispute that one with adaptive filters was never pursued during Kiani's time. Kiani specifically requested permission to "develop" such a pulse oximeter, but this request was denied. Third, the product is necessarily one developed "under supervision by Kiani." Again, this contradicts Nellcor's broad claim since Kiani neither developed nor supervised the development of pulse oximeters incorporating adaptive filters.

Other portions of the Mutual Release fortify Masimo's position that the Mutual Release was not intended to prevent Kiani from using the adaptive filter concept. The clause that actually uses the term "Product" proclaims that Kiani releases "any claim of ownership to the Product." Whether an idea is owned by someone is a legally distinct question from whether one is entitled to use an idea. If the parties actually intended not only to clarify the ownership of the Product, but also to exclude Kiani from practicing certain technologies, it would have been more logical for the Mutual Release to not merely define the ownership of the Product, but to also explicitly exclude Kiani from practicing any of the technologies developed or conceived during his tenure at Newport.

Not only does the Mutual Release appear not to equate ownership with right to use, but it seems to state just the opposite relationship. To begin with, the Recitals state that there is a history of dispute between Kiani and Newport over both the "Product as developed by Newport and the proprietary nature of the technology utilized in the Product." (Mutual Release at 1.) It thus makes a distinction between the Product—i.e., the resulting object developed—and the technology incorporated in the Product. Kiani, however, releases only his claim of ownership "to the Product" and not to any underlying technology. (Mutual Release ¶ 2.)

Furthermore, Newport releases Kiani from any liability that might otherwise accrue "related to or based upon the Product and/or Newport or upon the development and production of any product which may be deemed to be competitive with the Product or with Newport . . . , or with any company which may be in competition with Newport." (Mutual Release ¶ 2.) If, in fact, Product comprised not only Rev. 1, but any other ideas associated with pulse oximetry, this release by Newport would

be nonsensical. How could Kiani realistically compete with Newport if use of adaptive filters in pulse oximeters—or for that matter, work on pulse oximeters in general—would violate the ownership clause? The two sections, however, are in harmony if the ownership clause in Paragraph 1 only refers to who owns the property that was developed at Newport while the competition release in Paragraph 2 clarifies that the underlying technology is free to be used by either party.

The last sentence of Paragraph 2 confirms the reading that the Mutual Release is not intended to prevent Kiani from practicing any skills acquired during his time at Newport. There, Newport "acknowledges that Kiani is not in possession of any proprietary information of Newport." (Mutual Release ¶ 2.) It appears unambiguous that this possession clause was intended to be an acknowledgment by Newport that Kiani did not leave with any Newport proprietary information, whether stored in his brain or in physical, tangible form.

Notwithstanding the apparent meaning of this sentence however, Nellcor suggests that the "proprietary information" is limited only to "software and other proprietary materials." (Opp'n at 17.) In other words, Nellcor argues that in the last sentence of Paragraph 2, Kiani meant only for Newport to acknowledge that Kiani had not stolen any tangible products or designs.

That this reading reflects the intent is implausible. To begin with, nothing in the sentence suggests that the Newport proprietary information is only proprietary information in physical form. As well, Nellcor's reading would render the competition release in Paragraph 2 redundant. If, as Nellcor argues, Kiani's release of ownership in Paragraph 1 was also a release of any right to use the underlying

technology, the competition release in Paragraph 2 would be essentially moot, since any proprietary information in the hands of Kiani could not be used by Kiani without otherwise breaching the Mutual Release. *See* Cal. Civ.Code § 3451 ("An interpretation which gives effect is preferred to one which makes void.").

Thus, the only reasonable reading of the Mutual Release is that while Newport owned any physical product produced by Kiani during his time at Newport, the ideas developed and conceived during that period are not the property of Newport. *See* Cal. Civ.Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.").

### IV. Conclusion

For the foregoing reasons, Masimo's motion for summary judgment is GRANTED.

IT IS SO ORDERED.